UNSEALED
1-14-05

**In The United States District Court For**

**The Eastern District of Texas**

**Beaumont Division**

FILED - CLERK
U.S. DISTRICT COURT

2003 FEB 25 PM 3: 56

TX EASTERN-BEAUMONT

BY _Barbara S. Thurel_

¶ 103CV0116

| | | |
|---|---|---|
| United States of America and the | * | |
| | * | |
| State of Texas | * | |
| | * | |
| ex rel Linda K.S. Hitter | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | |
| | * | |
| Baptist Hospitals of Southeast, DBA | * | |
| Memorial Hermann Baptist Hospital at | * | |
| Beaumont | * | **FILED IN CAMERA** |
| and | * | |
| Memorial Hermann Healthcare System | * | **AND** |
| and | * | |
| Memorial Hermann Baptist Orange Hospital | * | |
| and | * | **FILED UNDER SEAL** |
| Baptist Hospitals of Southeast Texas | * | |
| and | * | |
| Baptist Physician Network | * | |
| and | * | |
| Baptist Beaumont Properties, LLC | * | |
| and | * | |
| Baptist Orange Properties, LLC | * | |
| and | * | |
| Beaumont Medical Office Building Limited | * | **CIVIL ACTION NO.** |
| and | * | |
| Orange Medical Office Building Limited | * | |
| and | * | |
| VHA Southwest Community Health Corporation | * | |
| and | * | |
| Southwest Community Hospital, Inc. | * | |
| and | * | |
| Memorial Hermann Hospital System | * | **JURY TRIAL DEMANDED** |
| and | * | |
| Memorial Hermann Foundation | * | |
| and | * | |
| Memorial Hermann Affiliated Services, Inc. | * | |
| and | * | |
| Jeffery Goldstein, M.D. | * | |
| and | * | |

Charles Self , M.D.                              *
            and                                  *
Louis Ferguson, M.D., CFO                        *
                                                 *
        Defendants                               *
                                   ***************

## COMPLAINT
## False Claims Act

This action filed pursuant to the Qui Tam provisions of the False Claims Act (31 U.S.C., Sections 3729 et. seq.), the Texas Medicaid Fraud Prevention Law, Tex.Hum.Res. Code Sections 36.001-36.117 and principles of common law, is based on a scheme by the Defendants, Baptist Hospitals of Southeast, DBA Memorial Hermann Baptist Hospital at Beaumont, Memorial Hermann Healthcare System, Memorial Hermann Baptist Orange Hospital, Baptist Hospital of Southeast Texas, Baptist Physician Network, Baptist Beaumont Properties, LLC, Baptist Orange Properties, LLC, Beaumont Medical Office Building Limited, Orange Medical Office Building Limited, VHA Southwest Community Health Corporation, Southwest Community Hospital, Inc, Memorial Hermann Hospital System, Memorial Hermann Foundation, Memorial Hermann Affiliated Services, Inc. ,Dr. Jeffery Goldstein, Dr. Charles Self and Louis Ferguson, M.D.CFO.

Plaintiff, Linda K.S. Hitter, by and through the undersigned counsel, and acting on behalf of and in the name of, The United States of America and the State of Texas, alleges as follows.

### Parties

1.      Plaintiff, Linda K.S. Hitter, is a citizen of the United States of America and a resident of the State of Texas. The Relator is suing on her own behalf and on behalf of, and in the name of, The United States Government, pursuant to 31 U.S.C., Section 3730(b) and on behalf of and in the name of the State of Texas pursuant to Tex.Hum.Res. Code Section 36.101 et seq.. The Relator was employed by the Defendant, Baptist Hospitals of Southeast, DBA Memorial Hermann Baptist Hospital from December 2000 through February 2002 as the medical auditor .

2.      The United States administers the Federal Medicare Program through its agency, The Department of Health and Human Services (DHHS), and the Center for Medicare and Medicaid Services (CMS).  CMS is authorized to enter into and administer contracts on behalf of DHHS and the United States. Inclusive in CMS's contracting authority is the responsibility for administering the Federal Medicare Program and the payment and reimbursement of Medicare claims processed by Medicare contractors.

3.      The State of Texas administers the Texas Medicaid Program through its agencies, the Texas Department of Human Services and the Texas Department of Health.  These two agencies are authorized to enter into and to administer contracts on behalf of the State of Texas with fiscal agents who receive, process and pay claims under the Texas Medicaid Program.  Inclusive in the Texas Department of Human Services and the Texas Department of Health's contracting authority, it is the responsibility for administering the Texas Medicaid Program and the payment and reimbursement of Medicaid claims processed by Medicaid contractors.

4.      That the Defendants, Baptist Hospitals of Southeast, DBA Memorial Hermann Baptist Hospital at Beaumont, Memorial Hermann Healthcare System, Memorial Hermann Baptist Orange Hospital, Baptist Hospital of Southeast Texas, Baptist Physician Network, Baptist Beaumont Properties, LLC, Baptist Orange Properties, LLC, Beaumont Medical Office Building Limited, Orange Medical Office Building Limited, VHA Southwest Community Health Corporation, Southwest Community Hospital, Inc, Memorial Hermann Hospital System, Memorial Hermann Foundation, Memorial Hermann Affiliated Services, Inc are Texas businesses and corporations with their principal offices in Beaumont Texas.  Defendants are in the business of providing general medical healthcare and supplies, surgical services, emergency room services, operating room services, pharmacy and pharmaceutical services, coronary care, oncology services, general surgical services, psychiatry and psychology services, radiology services and other generalized inpatient and outpatient hospital services.  That the Defendants provided services throughout the eastern district of Texas and throughout the State of Texas.

5.     That the Defendants,  Jeffery Goldstein, M.D., Charles Self, M.D., are licensed medical healthcare providers who are either employed by or have privileges with the Co-Defendant Hospital facilities.  Defendants are in the business of providing general medical healthcare, surgical services and other medical services to patients throughout the Eastern District of Texas.

6.     That the Defendant, Louis Ferguson, M.D., is the CFO for Co-Defendant Baptist Hospital of Southeast. Defendant is in the business of administrating and coordinating the healthcare provided by Defendant Hospital facilities and is responsible for administrating and coordinating the Medicare and Medicaid billing procedures for said facilities. That Defendant Fergusons administrative services are undertaken throughout the Eastern District of Texas.

7.     That the Defendants are engaged in a number of activities,  which violate the Federal False Claims Act and the requirement and constraints imposed by DHHS and CMS      :

### Jurisdiction and Venue

8.     This Court has jurisdiction in this matter pursuant to 31 U.S.C., Section 3732(a) and 28 U.S.C., Sections 1331 and 1345. The Court further has supplemental jurisdiction pursuant to 28 U.S.C. Section 1365, to hear claims submitted hereunder concerning actions for violation of the Texas Medicaid Fraud Prevention Law, Tex.Hum.Res. Code Sections 36.001-36117, for which claims form, a part of the same case or controversy. The supplemental claims do not substantially predominate over those claims within the original jurisdiction of the Court.

9.     The Plaintiff has direct and independent knowledge within the meaning and definition of 31 U.S. C., Section 3730(e)(4)(B) derived through and from Plaintiff's employment with the Defendants, of all of the information on which the allegations set forth in the Complaint are based, and Plaintiff has voluntarily provided the information contained in the Complaint to the government through her written disclosure of material evidence.  Plaintiff has also provided the information contained in the Complaint to the government

pursuant to an in person disclosure meeting with the Department of Justice and the United States Attorneys

Office on February 24, 2003. None of the allegations set forth in this Complaint are based on a public

disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a Congressional,

administrative or general accounting office report, hearing, audit, investigation or from the news media.

10.     Venue, in the Eastern District of Texas is proper under 31 U.S.C., Section 3732(a) and 28

U.S.C., Sections 1391(b)(c).

### Federal Medicare Program/Texas Medicaid Program

11.     DHHS, through CMS, provides health insurance to eligible aged and disabled Americans

(Medicare beneficiaries) pursuant to the provisions of the Medicare Program, Title XVIII of the Social Security

Act, 42 U.S.C., Sections 1395, et. seq.. The Medicare Program provides health care services and benefits to

certain eligible groups such as persons over age sixty-five, disabled persons and qualifying homebound persons

in need of medical/nursing care. The Medicare Program is administered under two distinct parts. Medicare

Part A, "Hospital Insurance for the Aged and Disabled", covers health care services furnished by hospitals,

home health agencies, hospices, and skilled nursing facilities.   Medicare Part B, "Supplementary Medical

Insurance for the Aged and Disabled', covers laboratory services, x-rays, physicians' services and other non-

institutional services, such as medical supplies and durable medical equipment (DME), as well as some other

services not reimbursed under Medicare Part A.

12.     The Texas Medicaid Program is administered through the Texas Department of Human

Services and the Texas Department of Health through their fiscal agents in order to process claims in a similar

fashion to Medicare, on behalf of those persons who are eligible for benefits under the Texas Medicaid

Program.

13.     That the Defendants applied to CMS and its predecessor, the Health Care Finance

Administration (HCFA) for reimbursement under Medicare Parts A and B for providing medical and hospital

care as well as medical supplies and materials. All of these services, supplies, materials and care provided, would be documented in such a fashion so as to purportedly justify and substantiate a basis to qualify for billing under Medicare and these charges would then be processed by the Defendants through CMS and its predecessor HCFA under Medicare Parts A and B. That the Defendants applied to the Texas Department of Health and Department of Human Services through its fiscal intermediaries for reimbursement under the Texas Medicaid Program for providing medical and hospital care, as well as, medical supplies and materials to participants in the Texas Medicaid Program.

### Factual Background

14.     That the Relator incorporates by reference herein each and every allegation and statement contained in the paragraphs stated herein above and specifically incorporates those allegations as to fraud as delineated herein.

15.     That the Relator was employed by the Defendants from December 2000 through February 2002 as the medical auditor for Memorial Hermann Baptist Hospital reporting directly to the hospitals CFO, Louis D. Ferguson. That as a result of the Relators position with Memorial Hermann Baptist Hospital she has learned that there are numerous and abundant violations of the requirements imposed by Medicare and Medicaid and a failure of compliance with those regulations as conducted by the Defendants. There are multiple areas of fraud related to the operation of the Defendants healthcare facilities and its subsidiaries and affiliates.

16.     Relator would identify an area of fraud relating to the operating room at Memorial Hermann Baptist Hospital at Beaumont. There were regular incorrect charges for suture kits. These charges were the wrong charges and were excessive, and were not properly payable through Medicare and Medicaid. Regardless of the charges being incorrect and excessive these charges were, in fact, still processed through

CMS for Medicare as wells as Medicaid and reimbursement was received by the Defendants knowing that same was a fraudulent claim.

17.     Another area of fraud relates to the coronary care units at Defendants healthcare facilities. The hospitals are utilizing experimental devices and procedures, such as a Rotablator and the Baxter Coronary Guide Wire, which are unapproved devices for Medicare and Medicaid billing purposes. However, even with this knowledge the hospitals utilized these devices and billed Medicare and Medicaid for same knowing that these devices are unapproved. This is billed through the physicians services and Medicare and Medicaid reimbursement has been provided to the hospitals knowing same is unapproved.

18.     A regular practice of fraud, which was ongoing at Memorial Hermann Baptist Orange Hospital, and particularly in the emergency room was the fraudulent identification of drugs from the emergency room pharmacy. The pharmacy would bill and process Medicare and Medicaid reimbursement claims for name brand pharmaceuticals, however, they would distribute generic pharmaceuticals to the patients from the emergency room pharmacy. As a result of the billing for name brand pharmaceuticals to Medicare and Medicaid, who would reimburse based upon the claimed medication distributed, there was an overcharging or upcoding of the pharmaceuticals over and above the cost of the generic medication.

19.     The next prolific area of fraud relates to the duplicate billing undertaken by the emergency rooms. The Defendants emergency rooms would regularly administer medications, injections or other applications and would then bill for the same service twice. These multiple charging submissions would be sent Medicare and Medicaid and the Defendants would receive duplicate reimbursement for single services.

20.     The psychiatry and psychology departments of Defendants hospitals maintained a per diem billing process for all patients. Even though patients would be admitted at the end of the day, after all therapy groups and sessions had concluded for that day, the hospital would charge Medicare and Medicaid for a full day's service of therapy and sessions. Additionally, the Defendants psychiatry and psychology departments

would discharge patients in the morning, prior to their therapy groups and session treatments, but again would submit charges and claims for a full days care.

21.     The Defendants Interventional Radiology facilities regularly maintained a practice of duplicate billing. The process would be that the facility would bill for the same charges that the physician undertook. The physician would individually charge a patient for the care provided and then the Defendants would submit a physician charge though the hospital relating to the radiology service provided. Within interventional radiology, the Defendants would also create the need for duplicate services. By way of example, a patient would come to the Cath Lab for a "De-Clot" of the renal dialysis catheter. The patient would tell the hospital that the doctor informed them that the catheter was clogged. However, they would not have a written order from the doctor. The only documentation which the patient would have, would be a "canned" prescription from the office of Jeffery Goldstein, M.D. and same would be stamped by the radiology technician. The hospital would then schedule a de-clot and Dr. Goldstein would perform the de-clot. He would first treat the patient with Retaplace. However, he would not document the amount used, so that there was nothing to match the bill with, in order to see whether Medicare or Medicaid was being over billed. Dr. Goldstein would also unbundle and charge for two procedures on PTAV charges (catheterization). When an artery or vessel would be ballooned twice, during the same procedure, Medicare and Medicaid were charged for two procedures even though it was a single intervention with a catheter and it was a single process. However, the ballooning took place twice in the same vessel. According to the Medicare and Medicaid guidelines, this should be a single charge. Interventional Radiology also billed for multiple angiographies, which were not coded by medical records. It would be common to see two or three angiographies billed along with two or three PTAV procedures. Lastly, Dr. Goldstein's central venous catheter patients would be duplicate billed for catheter changes. The patients would be charged $1,433.30 to remove the existing catheter and would then be charged

$1,433.30 to insert the new catheter. This is a single procedure and should only be billed as such. The multiple billing is violative of the Medicare and Medicaid guidelines.

22.     Another fraudulent practice area relates to the hospitals general pharmacy. The pharmacies would bill for prescription quantities of 999 orders per patient. Even though this problem was made known to the facilities CFO, Louis Ferguson, no action was taken to correct the problem or to repay Medicare or Medicaid. An accountant's audit was conducted with Managed Care Accounts on January 24, 2002 for which a query was run asking to identify all patients who received over 30 units of a pharmaceutical per day. The queries were run from April 1, 2001 through January 16, 2002. The query response for the hospital at Beaumont was 30 pages long and the query report for the hospital at Orange was 15 pages long. After again going to the CFO, Louis Ferguson, concerning this issue the Relator was advised that the outcome of the error investigation concerning over billing for pharmaceuticals was approximately $2.5 Million. It is the Relator's belief that this figure is actually greater then the $2.5 Million represented by the CFO.

23.     That the Defendants Oncology Center bills fraudulently for the treatment with "Brachy Seeds" (radioactive seeds) in that the service should be provided as an outpatient oncology service. However, the Defendants would admit the patients to their facility for a one or two day stay, whichever will be the greatest reimbursement under Medicare and Medicaid.

24.     At Memorial Hermann Baptist Orange Hospital pregnant patients who would present to the emergency room would be billed for a full emergency room visit and would then be sent to the obstetrician for evaluation. The patient would then be charged for a special procedure room charge in order to have the obstetrician listen to the fetal heart tones and to do an internal exam. The patient would then be returned to the emergency room. The additional charge for a special procedure room charge is inappropriate and is a multiple charge for an emergency room visit. The visit should merely be charged as an emergency visit, with a consult

by the obstetrician.  Accordingly, Medicaid would be billed for at least one, if not two, emergency room charges, as well as, a specialized obstetrical department charge.

25.      That the last area of fraud relates to duplicate billing in the Wound Care Center's billing unit. An audit conducted as a result of patients complaints, revealed duplicate charges for debridement of wounds. The physicians at the Wound Care Center would be charging for each and every wound that would be debrided, rather then charging in accordance to the area debrided or the amount of time spent on debridements. Many of these patients have multiple small ulcerations.  These ulcerations would be in a single area, and would be minimal in size.  However, if there were four or five small ulcerations, the physicians would be charging for four or five debridements to that same area, rather then a single debridement charge for the area. That in accordance with Medicare and Medicaid guidelines these are inappropriate charges.

26.      That the Relator has brought these multiple issues of fraud to the Director of Medical Records, the Director of Interventional Radiology and the CFO, Louis Ferguson, regarding all of these fraudulent issues.

27.      That as a result of the Complaints, which the Relator and others have made, nothing has changed relating to the practice of fraudulent billing or provision of services other than the Relator being discharged due to her complaints. The Relator continued to express her concerns over the fraudulent practices up until the date of her discharge by the Defendants.

28.      That the Relator would project that the pharmaecutical mis-billings to Medicare amd Medicaid constitute an amount no less then $2.5 Million.

29.      In regards to radiology and the de-clotting and PTAV procedures undertaken, Relator is aware that approximately 5-10 patients are seen per week with charges ranging between $6,000.00 and $10,000.00 per PTAV.

30.      The Relator's review of the overcharges have indicated that the emergency room department at Beaumont averages 2,600 visits per month and the emergency room at Orange averages approximately 1,700

per month. Approximately 385 patients access the operating room holding unit on the west campus per month and approximately 160 patients access the operating room holding unit on the east campus per month. There are approximately 280 per month in the Orange operating room holding unit.  It is the Relator's understanding that as a conservative estimate, at least 55% of all patients served are Medicare/Medicaid patients.

31.     That Relator would project that, based upon her review and audits of the records of the Defendants and based upon investigation and discussions undertaken, that there is ongoing fraud to Medicare and Medicaid for which the Federal Government and the State of Texas is entitled to reimbursement in an amount of no less then $25 Million. That based upon Relators review of all information, the review of memorandums and materials, information received through co-workers, and based upon her job duties, it is clear that there has been fraud relating to all of the above areas prior to her employ in 2000 and continuing since her discharge in 2002.

### Count One - False Claims Act
**(Presentation of False Claims)**

32.     That the allegations of Paragraph Nos. 1 through 30 are incorporated by reference herein as if each is fully set forth.

33.     That Baptist Hospitals of Southeast, DBA Memorial Hermann Baptist Hospital at Beaumont, Memorial Hermann Healthcare System, Memorial Hermann Baptist Orange Hospital, Baptist Hospital of Southeast Texas, Baptist Physician Network, Baptist Beaumont Properties, LLC, Baptist Orange Properties, LLC, Beaumont Medical Office Building Limited, Orange Medical Office Building Limited, VHA Southwest Community Health Corporation, Southwest Community Hospital, Inc, Memorial Hermann Hospital System, Memorial Hermann Foundation, Memorial Hermann Affiliated Services, Inc., Dr. Jeffery Goldstein, Dr. Charles Self and Louis Ferguson, CFO., knowingly presented false or fraudulent claims for payment or caused false or fraudulent claims to be presented to officers or employees of the United States government in violation

of 31 U.S.C., Section 3729(a)(1).  As a result of Defendants conduct, the United States suffered actual damages.

### Count Two - False Claims Act
### (Presentation of False Statements)

34.    That the allegations of Paragraph Nos. 1 through 32 are incorporated by reference herein as if each is fully set forth.

35.    That Baptist Hospitals of Southeast, DBA Memorial Hermann Baptist Hospital at Beaumont, Memorial Hermann Healthcare System, Memorial Hermann Baptist Orange Hospital, Baptist Hospital of Southeast Texas, Baptist Physician Network, Baptist Beaumont Properties, LLC, Baptist Orange Properties, LLC, Beaumont Medical Office Building Limited, Orange Medical Office Building Limited, VHA Southwest Community Health Corporation, Southwest Community Hospital, Inc, Memorial Hermann Hospital System, Memorial Hermann Foundation, Memorial Hermann Affiliated Services, Inc.,  Dr. Jeffery Goldstein, Dr. Charles Self and Louis Ferguson, CFO. knowingly made or used, or caused to be made or used, false records or statements in order to get the payment or approval of false or fraudulent claims, paid or approved by officials of the United States government in violation of 31 U.S.C., Section 3729(a)(2).  As a result of the Defendants conduct, the United States suffered actual damages.

### Count Three - False Claims Act
### (Presentation of False Statements)

36.    That the allegations of Paragraph Nos. 1 through 34 are incorporated by reference herein as if each is fully set forth.

37.    That Baptist Hospitals of Southeast, DBA Memorial Hermann Baptist Hospital at Beaumont, Memorial Hermann Healthcare System, Memorial Hermann Baptist Orange Hospital, Baptist Hospital of Southeast Texas, Baptist Physician Network, Baptist Beaumont Properties, LLC, Baptist Orange Properties,

LLC, Beaumont Medical Office Building Limited, Orange Medical Office Building Limited, VHA Southwest Community Health Corporation, Southwest Community Hospital, Inc, Memorial Hermann Hospital System, Memorial Hermann Foundation, Memorial Hermann Affiliated Services, Inc., Dr. Jeffery Goldstein, Dr. Charles Self and Louis Ferguson, CFO. knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid or decrease its obligation to pay, transmit, or return money or property, to the United States government in violation of 31 U.S.C., Section 3729(a)(7). As a result of the Defendants conduct, the United States suffered actual damages.

### Count Four - Payment by Mistake of Fact

38.     That the allegations of Paragraph Nos. 1 through 36 are incorporated by reference herein as if each is fully set forth.

39.     As a result of and in consequence of the aforesaid conduct, the United States' Reimbursement of Medicare Parts A and B Claims were not properly reimbursable and the United States paid the Defendants for Medicare Parts A and B claims for which Defendants were not entitled.

40.     At the time, the United States made such payments, government officials were unaware of the wrongful conduct of the Defendants. Had the United States known that the Defendants was not entitled to receive reimbursement or payment under Medicare Parts A and B for the medical supplies, the United States would not have approved the payment of such funds.

41.     That as a result of the aforesaid acts, omissions and conduct, the United States is entitled to recover the funds paid to the Defendants by mistake.

### Count Five - Breach of Contract

42.     That the allegations of Paragraph Nos. 1 through 40 are incorporated by reference herein as if each is fully set forth.

43.     That the employment and retention of the Plaintiff by the Defendants, constitutes a contract of employment between Plaintiff and Defendants.

44.     That Defendants breached the contract with the Plaintiff by disciplining her for reporting the improper billings which would not entitle the Defendants to reimbursement through Medicare, Medicaid and CMS standards, all of which were resulting in the presentation of false claims, unethical practices and financial misconduct.

45.     That as a result of Defendant's breach of contract, Plaintiff was harassed, and discharged from her position with the Defendants, resulting in compensatory damages for lost wages, benefits and other losses.

### Count Six - Retaliatory Discharge

46.     That the allegations of Paragraph Nos. 1 through 43 are incorporated by reference herein as if each is fully set forth.

47.     That Plaintiff alleges that the actions taken against her, which resulted in her discharge by the Defendants was motivated, in a substantial part, by her having reported false claims, violation of CMS, Medicare and Medicaid billing procedures.

48.     That the violations which Plaintiff complained of included violation of the False Claims Act 31 U.S.C., Section 3729 et. seq. and Federal Regulations relating to the conduct and nature of procurement when Federal monies are being expended.

49.     That pursuant to 31 U.S.C. Section 3730(h), there is a specific cause of action for employees who are disciplined or discharged for their efforts at taking steps "in furtherance of action under this section". Plaintiff's conduct in reporting the violations within the administrative process of the Defendants' company as identified in the Statement of Facts, was clearly done in furtherance of an action within the meaning of this section.

50.     That the on-site pressures and harassment received by the Plaintiff, and eventually termination entitles her to relief specifically described in 31 U.S.C. Section 3730(h).

## Count Seven – Violation of Texas Medicare Fraud Prevention Law
## Section 36.052

51.     That the allegations of Paragraph Nos. 1 through 49 are incorporated by reference herein as if each is fully set forth.

52.     That the Defendants and each of them knowingly presented false or fraudulent claims for the payment or cause false or fraudulent claims to be presented to officers or employees of the State of Texas, the Texas Department of Human Services or the Texas Department of Health or any other Texas State agency under who a Medicare claim may be submitted, in violation of Tex. Hum. Res. Code Section 36.052.  As a result of Defendants conduct and actions, the State of Texas has suffered actual damages.

## Prayer for Relief

**WHEREFORE,** the Plaintiff, Linda K.S. Hitter (Relator), acting on behalf of and in the name of the United States of America, demands and prays that judgment be entered in favor of the United States and against the Defendants, Baptist Hospitals of Southeast, DBA Memorial Hermann Baptist Hospital at Beaumont, Memorial Hermann Healthcare System, Memorial Hermann Baptist Orange Hospital, Baptist Hospital of Southeast Texas, Baptist Physician Network, Baptist Beaumont Properties, LLC, Baptist Orange Properties, LLC, Beaumont Medical Office Building Limited, Orange Medical Office Building Limited, VHA Southwest Community Health Corporation, Southwest Community Hospital, Inc, Memorial Hermann Hospital System, Memorial Hermann Foundation, Memorial Hermann Affiliated Services, Inc., Dr. Jeffery Goldstein, Dr. Charles Self and Louis Ferguson, CFO on Counts One through Seven of the Complaint as follows:

1.     On Count One - False Claims Act (Presentation of False Claims)- for treble the amount of damages suffered by the United States plus civil penalties of Ten Thousand ($10,000.00) Dollars for each false claim.

2.      On Count Two - False Claims Act (Presentation of False Claims)- for treble the amount of damages suffered by the United States plus civil penalties of Ten Thousand ($10,000.00) Dollars for each false statement or false record.

3.      On Count Three - False Claims Act (Presentation of False Claims)- for treble the amount of damages suffered by the United States plus civil penalties of Ten Thousand ($10,000.00) Dollars for each false statement or false record.

4.      On Count Four - Payment by Mistake of Fact- for the return of all government funds paid by mistake or through the erroneous acts of the Defendants plus pre-judgment interest.

5.      For all accrued interest, cost and attorneys fees.

6.      For such other and further relief as the Court deems just and equitable.

**MOREOVER,** Relator, Linda K.S. Hitter, on her own behalf demands and prays that an award be made in her favor as follows:

a.      For 25% of the proceeds collected by the United States, if the United States intervenes in and conducts this action, or, for 30% of the proceeds if the United States does not intervene;

b.      As to Count Five - Breach of Contract- for immediate reinstatement, reimbursement of all back pay and benefits;

c.      As to Count Six - Retaliatory Discharge- for Reinstatement of the Plaintiff and payment for two times the amount of back pay, interest on the back pay and compensation for special damages, including attorneys fees and costs;

d.      For an amount for reasonable expenses necessarily incurred by the Relator in the prosecution of this action;

e.      For all reasonable attorneys fees and costs incurred by the Relator in connection with these proceedings; and

f.       For such other and further relief to which the Relator may show that she is justly entitled.

**WHEREFORE**, the Plaintiff, Linda K.S. Hitter,  (Relator) acting on behalf of and in the name of the State of Texas, demands and prays that a Judgement be entered in favor of the State of Texas and against the Defendants,   Baptist Hospitals of Southeast, DBA Memorial Hermann Baptist Hospital at Beaumont, Memorial Hermann Healthcare System, Memorial Hermann Baptist Orange Hospital, Baptist Hospital of Southeast Texas, Baptist Physician Network, Baptist Beaumont Properties, LLC, Baptist Orange Properties, LLC, Beaumont Medical Office Building Limited, Orange Medical Office Building Limited, VHA Southwest Community Health Corporation, Southwest Community Hospital, Inc, Memorial Hermann Hospital System, Memorial Hermann Foundation, Memorial Hermann Affiliated Services, Inc., Dr. Jeffery Goldstein, Dr. Charles Self and Louis Ferguson, M.D.CFO on count Seven of the Complaint and as follows:

1.       On Count Seven – Violation of the Texas Medicaid Fraud Prevention Law-

(a)       For a civil penalty of not less than $5,000.00 or more that $15,000.00 for each unlawful act committed by the Defendants that resulted in injury to an elderly person, a disabled person or a person younger that eighteen years of age.

(b)       A civil penalty of not less than $1,000.00 or more than $10,000.00 for each unlawful act committed by the Defendants, that does not result in injury to a person stated in the prayer for relief above.

(c)       Restitution of the value of any payment or monetary or in kind benefit provided under the Medicaid program directly or indirectly as a result of the unlawful act.

(d)       Interest on the value of the payment or benefit at the pre judgement interest rate in effect on the day the payment of benefit was received or paid, for the period from the date the benefit was received or paid to the date that restitution is paid to the State.

(e)       Two times the value of the payment or benefit to be paid under the restitution provision of this prayer.

**MOREOVER,** The Relator, Linda K.S. Hitter, on her own, demands and prays that an award be made

in her favor as follows.

1.    For 25% of the proceeds collected by the State of Texas:

2.    For payment for reasonable expenses that have been necessarily incurred

3.    Plus reasonable attorneys fees and costs

4.    For such other and further relief to which the Relator may show that she is justly

entitled.

## Demand For Jury Trial

Plaintiff, Linda K.S. Hitter, demands that this case be tried before a jury.

Thomas Kiehnhoff, Esquire
REAUD, MORGAN AND QUINN
801 Laurel
Beaumont, Texas  77701
(409) 838-1000
Bar No. 24031311

Lon C. Engel, Esquire
ENGEL & ENGEL, P.A.
11 E. Lexington Street, Suite 200
Baltimore, Maryland 21202
(410)727-5095

Attorneys and Counsel for Plaintiffs     Date: 2/25/03

## CERTIFICATION OF SERVICE

We hereby certify under the penalties of perjury that on this 25th day of Feb , 2003,

we caused a copy of the aforegoing Complaint for Money Damages and Civil Penalties under the False Claims

Act and Common Law, and Relators Disclosure Statement of Material Evidence and Information, to be served

by registered or certified mail to: The Honorable John Ashcroft, Attorney General, United States Department

of Justice, 10th & Constitution Avenue, N.W., Washington, D.C. 20006 and by delivery to: Matthew D.

Orwig, United States Attorney, Eastern District of Texas, 350 Magnolia Avenue, Suite 150, Beaumont, Texas,

77701-2237 and to Assistant United States Attorney, Michael Lockhart, Esquire, 350 Magnolia Avenue, Suite

150, Beaumont, Texas, 77701-2237 and served Certified Mail/Restricted Delivery to the Attorney General for

the State of Texas, Greg Abbott, Office of the Attorney General, 300 West 15th Street, Austin, Texas, 78701.


Thomas Kiehnhoff, Esquire
REAUD, MORGAN AND QUINN
801 Laurel
Beaumont, Texas  77701
(409) 838-1000
Bar No. 24031311

Lon C. Engel, Esquire
ENGEL & ENGEL, P.A.
11 E. Lexington Street, Suite 200
Baltimore, Maryland 21202
(410)727-5095

3

RELATOR'S DISCLOSURE STATEMENT OF MATERIAL EVIDENCE AND
INFORMATION

The Relator, Linda K.S. Hitter, residing at 6465 Friar Tuck Ln, Beaumont, Tx. 77707,
presents the following information as it relates to the substance and merit of her Qui Tam
action against Baptist Hospitals of Southeast, D/B/A Memorial Hermann Baptist
Hospital, Beaumont, Memorial Hermann Healthcare System, Memorial Hermann Baptist
Orange Hospital, Baptist Hospitals of Southeast Texas, Baptist Physician Network,
Baptist Beaumont Properties, L.L.C., Baptist Orange Properties, L.L.C., Beaumont
Medical Office Building Limited, Orange Medical Office Building Limited, VHA
Southwest Community Health Corporation, Southwest Community Hospital, Inc.,
Memorial Hermann Hospital System, Memorial Hermann Foundation, Memorial
Hermann Affiliated Services, Inc., hereinafter known as "Baptist", its other affiliates, its
officers, directors and some of their employees.

The Relator has been employed from December, 2000 through February 2002 as the
Medical Auditor for Memorial Hermann Baptist Hospital, reporting directly to the
hospitals CFO.  It was the Relator's responsibility to review the reliability and integrity
of hospital financial and operating information as it related to the Chargemaster, to
review the compliance with hospital policies, plans and procedures in compliance with
the Federal Laws and Regulations that govern hospital charges. The CFO is Louis D.
Ferguson. David N. Parmer is the CEO of Baptist. Wilson Weber is the COO, Mike
Bowers is the Compliance Officer and Barbara Turner is the Director of the Business
Office in Beaumont and Debbie Britnell is over the Business Office in Orange. The
Relator was forced to leave her position as Director of Auditing as a result of Mr.
Ferguson's decision and the management's refusal to change their fraudulent billing
practices after repeated written and verbal notification from the Relator.  As a result of
these repeated notifications, the Relator was discharged by the CFO, Louis Ferguson.

There are multiple areas of fraud related to the operation of Baptist and its subsidiaries
and affiliates. One area of fraud relates to the cath lab.  The hospital has utilized
experimental devices and procedures, such as, a Rotablator, and the Baxter Coronary
Guidewire, which are unapproved devices for Medicare billing purposes.  The hospital
has utilized these devices and billed Medicare for this, knowing same are unapproved.
The CFO was notified of this problem per email on Jan. 15, 2002.

Another area of fraud is for duplicate billing in the Emergency Room.  The Emergency
Room would regularly administer medications and/or injections and bill twice as well as
bill for ER visits in duplicates. Suture removals were done in ER and charged even if
those sutures had been originally done in ER.  In Orange pregnant patients presenting to
the ER were charged for the ER visit, sent to OB for evaluation and charged for a special
procedure room charge to have OB personnel listen for fetal heart tones and do a vaginal
exam, patient was then returned to ER.  In Beaumont ER often the unit clerk,not the
clinical staff, would often assign the level of visit to be charged.  This person was not
licensed and was observed not working from a medical record  in order to determine the
level to be charged.  Relator spoke with the clerk regarding her liability and reported this
practice.

# EXHIBIT "A"

/

The East Campus Operating Room regularly charged in error for suture. Extra suture was billed under CDM #666004219 @ $447.84 each. During an investigation the Relator was told this number was set up for plastic suture charge. One patient complained that her bill of $6851.26 was too high for the removal of 3 moles. The extra suture charges on that bill were $1,343.52. These sutures should have been charged at $50.62 x 3. She was also billed for anesthesia she never received, IV's not given and a Recovery Room never entered.

Relative to the psychiatry/psychology department, the hospital (Fannin Pavilion) charges for a full day charges even when patients are admitted at the end of the day after therapy groups and sessions have ended for that day. Program charges are entered according to the midnight census and patients are charged for a full day of treatment plus room and board. Relator was informed patients were not charged for the last day (day of discharge).

In regards to Interventional Radiology, the facilities engage in fraudulent billing. Patients scheduled for an AV (Dialysis catheter) declot are scheduled from a sheet faxed to admitting from Dr. Goldstein's office. There is no signature or order from the referring physician. There is a stamped signature for Dr. Goldstein and for his radiology technician. The procedure is scheduled and done with no information pre-procedure other than what is contained on the scheduling sheet. There is a Short Stay Record hand written by Dr. Goldstein after the procedure and the information is little. One face sheet from admitting Relator has shows Dr. Goldstein as both the referring physician and the attending physician. Other face sheets reveal the following: 19 list Dr. Goldstein as the attending physician without any physician as either the referring or the primary physician, and 2 others have no referring physician but do have Dr. Goldstein as the attending. The patient would be sent to day surgery, treated with Retaplace. However, the dosage given by Dr. Goldstein was not documented so there was nothing to match with the bill to see that Medicare was not being over charged. There was unbundling with the PTVA charges for if the catheter was ballooned twice in the conduit (same vessel) Medicare was charged for 2 procedures and often for two PTVA S&I's. They were also billed for multiple Angiographies which were not coded by Medical Records as they considered the Angio to be an integral part of the PTVA. It was common to see 2 or 3 Angio's and Angio S&I billed along with 2 or even 3 PTAV's and 1 or 2 PTAV S&I's. In addition to this it was common the see a charge for a declot with a balloon and a Fogarty catheter. The Short Stay Sheet when completed had very limited information on it, for instance, no amount of Reteplace used or amount of time for the procedure and no intra-procedure notes. The Relator brought the Short Stay Sheets to the Director of Medical Records, who is Betty Bullard, and asked her opinion on the limited information, and Ms. Bullard replied that it was pretty sparse information. The Relator has a section of several months of the patient scheduling log from Interventional Radiology-from April, 2001 through July, 2001. The number of cases for Dr. Goldstein on the East Campus log was as follows: April=63, May=34, June=48, July=53. The majority of these patients are Medicare patients and most bills contain duplicate charges. In addition to the PTAV patient bills, Dr. Goldstein's Central Venous Catheter patients were duplicate billed if they came in to have a catheter change. They were charged $1433.30 to remove the existing catheter and $1433.30 to insert a new catheter and if the patient was a Medicare patient no chest x-ray would be done but on the Insurance patients chest

x rays would be billed. A lot of these patients were revolving patients, meaning they would come in for a "clogged" catheter on a frequent basis. However, the documentation to substantiate doing dialysis declots in the Cardiac Cath Lab. The Relator is not convinced that a possibly contaminated dialysis case is appropriate to schedule in the Cardiac Cath Lab and spoke to the CFO about this. He agreed that it did not seem the appropriate place for non cardiac procedures to be done. On the West Campus in the cath lab Dr. Goldstein's bills are less likely to show duplicate billing and there is likely to be more documentation in the record.

A review of the billing indicates that prior to the audits there was no documentation available other than the Short Stay Sheet. The Director of Interventional Radiology is Charles (Chuck) Self. The Relator believes that Dr. Goldstein and Mr. Self are friends and therefore feels that the doctor and Mr. Self are well aware of the double billing practices, however, chose not to correct the problems until confronted with the audit results and even then they were defensive of their billing practice. The Relator also believes that the physician's billing and the hospital's billing were matched and that an audit of Dr. Goldstein's bills would likely reveal the same as the hospital audit revealed. Mr. Self advised the Relator that Dr. Goldstein has found a "very successful way to declot and wants to keep it secret" and that is the reason he does not document the dosage of Reteplace he uses. It is the understanding of the Relator that if you use Retaplace and then perform a diagnostic image to determine if the clot has broken up, you may not need to perform the more expensive PTAV. Retaplace used was in one of two forms either the smaller dosage or 0.4 @ $270.00 each or the 10 unit dose @ $3637.50. It is not unusual to see 2 of whichever form is used, therefore a charge of $7275.00 and no documentation to back the charge is not unusual. The code used for Retaplace was 37201. The cpt code for a PTAV is 35476, PTAV S&I is 75978 and charge for 1 PTAV + 1 ATAV S&I = $2911.30. The charge for 1 Angio + 1 Angio S &I (cpt=75790) would be $916.70. It was common to see 2 Angios charged + the S$I in which case that total would be $1148.90. In addition to the declot it was not unusual to find a charge for Canula declot w/ballon and that code should be 36870 and the hospital charge is $1200.00. Relator estimates the overbilling to Medicare in Interventional Radiology to be between 1 and 2 million dollars per year and would expect Dr. Goldstein's billing to be the same. Relator was told by a long time employee that "in the beginning when Dr. Goldstein first started he would put a temporary dialysis catheter in the patients and in a short time bring them back in and put in a permanent catheter. According to the LMRP from Trailblazers the hospital's FI "Percutaneous fistula declotting for the re-establishment of appropriate and adequate flow may encompass the following procedures. These need not all be performed on every dysfunctional fistula. Each of the following procedures may be considered reasonable and medically necessary:..." (see LMRP titled Arteriovenous (AV) Fistula Interventions to Improve Patency from http://www.the-medicare.com/lmrp. In said directive are listed reasons for denial and reason 2 is as follows:"Maintenance angioplasty i.e., angioplasty of a fistula that has not shown any clinical evidence of flow impediment, or angioplasty that is performed on a routine basis without sighs or symptoms of abnormality, has not yet been demonstrated to significantly reduce the incidence of subsequent clotting and is not covered by Medicare...".Given the sketchy documentation and lack of evidence that a fistula was indeed in occluded Relator feels there is good reason for denial of payment

on many of the declots. Both Mr. Self and Dr. Goldstein were provided with copies of this LMRP.

Another area of fraud is the Pharmacy (Relator lost her job because of this one). The Relator received notice from several people concerning the billing of this department. The Pharmacy is billing for quantities of 999 per patient One record showed an overbill of $300,898.80 and this was a Medicare patient billed on 12/14/01. Roy Bush, accountant, working with Managed Care accounts was asked by Relator on Jan. 24, 2002 to run a query to determine any additional accounts billed with a quantity over 30 per line item (per day). The queries were from April 1,2001 through Jan. 16, 2002. The Beaumont report was 30 pages long and the Orange report 15 pages. All of those accounts apparently were billed incorrectly. For example, the antibiotic Rocephin 1 Gm. was billed to one patient for 750 vials for a total of $73,400.00 for that drug. This was being done at both Orange Memorial and at Beaumont. The Relator has documents evidencing this. The Relator went to the CFO, who is Louis Ferguson, taking Roy Bush with her, to determine if the billing problems were program related or deliberate acts of fraud. The CFO called the Director of IT, Mark Henderson, and requested a query. Relator left work that day with Mr. Ferguson, Mr. Henderson and Mr. Bush talking. Nothing further was done. After an illness Relator returned to work and asked Mr. Bush the outcome of a meeting between himself, Mark Henderson, Louis Ferguson, Wilson Weber and Bob McCurry (Director of Pharmacy) regarding the 999 Pharmacy billing issue. All Mr. Bush revealed was that the group determined the reason for the bill errors was due to an oversight by the Pharmacy Director, that he failed to check reports available to him on a daily basis that would have pointed to the error. Relator asked Mr. Bush what the CEO's reaction was and he replied the CEO was not at the meeting but Mr. Weber's comment was,"David is going to shit." Relator asked Mr. Ferguson what was done and what was the outcome. It was her understanding that Mr. Ferguson intended to have Pharmacy audit the records from the queries. CFO had also told Relator to "get those audits done" [the across the range of service audits that were then possible to do as the Relator's software had been purchased and installed]"and set up an audit committee quickly because the first thing they will want to see is our compliance effort. We have about a month to get it done." Instead, upon return from an illness Relator discovered Mr. Ferguson going through a large stack of demand bills on his desk and marking apparently what he determined to be incorrect. He entered Relator's office with one demand bill and he appeared to be angry/upset. He curtly tossed the bill on Relator's desk and said "take a look at that and tell me what you see wrong with it, don't spend much time on it because I have a big stack of them to do." There were drugs Relator was not familiar with and called Pharmacy to determine the 24 hour lethal dose of those unfamiliar drugs and wrote that information in the margin and returned the bill to CFO. Relator informed the CFO that even she with an R.N. license did not know enough without input from Pharmacy to determine correct dosage of some of those drugs. Relator told Mr. Ferguson in the presence of Mr. Bush "the only way to be sure about those bills is to pull the medical records and check the documentation". Mr. Ferguson shook his head and kept at his task. She asked the CFO " do you want me to set up an audit committee meeting now?" He replied,"No." She also asked, "Do you want me to audit any of those bills?" He replied,"No." The Relator continued to question the CFO about the outcome of the error investigation and he finally stated that it was an overbilling in

4

the amount of $2.5 million. Since the CFO was not finished with his audit Relator suspects the actual figure to be higher than the stated $2.5 million.

There were numerous Pharmacy billing errors discovered throughout the Relator's employment on patient complaint audits, defense audits, business office audits and random audits. Some examples are as follows: Claritin 10mg tab charged at $294.60 per tablet, Nicoderm Patch priced at $447.30, Leuprolide 11.25mg/90 day- the AWP for this drug is $1132.73 and it was priced at $2708.40. Z Pam comes 6 to a pack and pharmacy miscalculated the price using the pack/6 vial price instead of a single dose price and priced it 6 times higher than it should have been and with the mark up the charge was $2400.84. In the old IT system of SMS Relator was told by business office personnel and discovered numerous patients with pharmacy charges still posting to the patient account long after the patient had been discharged. For example, on one patient with admit date 12/15/00 and discharge 12/16/00 pharmacy charges were still posting on 1/15/01 showing a date of service of 01/13/01. The item was D4 ¼ NS/KCL 20 meq. Relator was told by pharmacy that the interface between pharmacy and the main system did not always work correctly with the result of patients being still charged for pharmacy even up to a month after discharge. Relator also was given examples by a concerned employee of the Business Office of Medicare OP's being billed for rev. code 253 take home medication which is not allowed under Medicare.

The Cancer Center billing audits revealed that Brachy seed implants could be done OP but apparently physicians refused (and Director of Cancer Center Gay-Lynn Jones was reluctant) to do that preferring to keep patients for a day or two and bill Medicare. Relator has evidence that the hospital purchased the seeds but did not bill for them. The I 125 seeds cost between $82.00 to $126.00 per seed and it is common to see 100 seeds used in a single patient. An email report went out and a meeting occurred between the CNO Nancy Sims, Director of the Cancer Center ,Gay-Lynn Jones, CFO Louis Ferguson and Relator. When the Relator brought this to the attention of the CNO, CFO and Director of the Cancer Center their level of concern regarding those missed charges was relatively low and there was an attempt to shift responsibility for billing the implants to surgery. Relator stated that since Cancer Center was responsible for determining the dosage needed and for ordering the seeds it would seem Cancer Center should own the charging process. The Cancer Center audit was conducted at the directive of the CFO and during that audit a long time employee came to see Relator and warned her that "if you continue to dig in the Cancer Center you will lose your job." Relator suspects it would be a good idea to audit the oncology physicians billing.

Fraud was discovered in Plastic Surgery cases. Mark Larson, Curtis Larson and Dwayne Larson of Larson's Plastic Surgery will perform a Hernia Repair/Hysterectomy and Liposuction/Size Reduction Plastic Operation and bill Medicare for the medical procedure dropping the cosmetic codes. Insurance company would be billed for the cosmetic portion. Medicare was billed as OP and insurance company billed as IP. On one account the bill was falsified by changing the discharge date on the UB so as to bill the patient as OP yet the discharge date on the chart reflected the patient had been an IP. The Relator insisted that the Director of Business Office do a corrective action plan. It was done after many requests. Relator was told by the Business Office collectors "we have always been told to split bill the cosmetic claims, we have always done it that way." Relator instructed the collectors. The Supervisor of the collectors is Judy Pollard. Relator

has an email dated Dec.29,2000 from Kathryn Smith, Director of Case Management at the time of this investigation and in it she states:"...I made a couple of calls to 2 surgeons whom I respect as experts in this field. (not the group in question) [Dr's Larson's]. They [the group she called] expressed concern over this issue of split billing and both told me that cosmetics should be billed to the patient exclusively. The way the procedures are weighted it would be a very rare occurrence for any Medicare covered procedure to outweigh the cosmetic procedure and thus would not be considered as the primary diagnosis. I used the hernia examples as well as hysterectomy...I will be inclined to follow above advice and not hold Medicare responsible. In the case of commercial insurance I would think that again not splitting the bill would be appropriate. They would likely request a split bill if they intend to cover any portion of the procedure that meets their criteria. At any rate a full medical history would have to be obtained in advance of the procedure, the make a determination if medical diagnosis would supercede the cosmetic procedure. That will be difficult to obtain given the scheduling practices of this group.

Another area of fraudulent duplicate billing is in the area of Wound Care Center billing. During a patient complaint audit Relator discovered duplicate charges for debridement. Relator received an email from R.N. in charge of Wound Care Center on Nov. 27, 2001 and in it she states,"...the Drs here charge per wound. If he debrided 2 wounds, then he charged 2 debridements..." It was the Relators understanding that proper billing would be to charge 1 procedure even if 2 areas were debridement during that time. On one patient the physician documented two small ulcerations were debrided and the charge was for 2 debridement procedures. Most patients in the Wound Care Center are Medicare patients. The physician in charge of the Wound Care Center during the time of Relator's employment was Dr. Harold J. Mancusi-Ungaro,Jr. of Southeast Texas Plastic Surgery, Inc.

The Relator has reason to suspect that more than one Chargemaster exists in the hospital system. Relator has an email from OSI consultant. This firm reviewed the hospital's Chargemaster sending a report in Jan.,2001 and making an onsight visit with meetings after the report. In March, 2001 Relator asked OSI about a statement the consultant had made during an on site visit recently to go over her review with department managers. She made the statement that the version of the Chargemaster OSI was provided to conduct the review was not the same one in the system. Cynthia Roseberry from OSI replied,"...after the first few meetings we discovered that the charge master that Debbie had provided to the managers was different from the one that I had. And as I recall, Debbie postulated that possibly there are/were two charge masters in your system..." Relator has some information to suggest there may in fact be more than one chargemaster in the hospital system. Another issue surfaced during the OSI on site visit

The only figures Relator can provide in an attempt to calculate the estimated overcharges are as follows: ER department in Beaumont averages 2600 visits per month and in Orange ER 1700 per month. An estimated 385 patients access the OR holding unit on the West Campus per month, 160 patients in OR holding unit on East Campus per month and 280 patients in OR holding unit in Orange. OB East Campus averages 32 C. Sections per month. Relator was told by Julie Boothman, Controller, that an estimated 55% of the patients served were Medicare/Medicaid. She has no proof to validate these figures. Relator believes this hospital is a disproportionate share hospital.

OSI consultant Cynthia Roseberry suggested after her review of the hospital chargemaster that the charge being used by East Campus OR for a special procedures charge be looked at from the perspective of the Stark law to be sure the hospital was compliant. An email was sent to Mike Bowers,Compliance Officer, and to Louis Ferguson on March 13,2001 with all of the information available from East Campus OR on the clinical situation resulting in the use of the special procedures charge. Relator sent OSI's suggestion that the hospital have legal look at what the hospital was doing to be sure of compliance.  Relator never received a reply from Mr. Bowers or Mr. Ferguson regarding follow up or outcome.

In conclusion, it was noted during the preparation of this report that billing addresses on the demand bills are different. For the hospital in Beaumont the following addresses appear on different bills:

Memorial Hermann Baptist Beaumont
P.O.Box 201717
Houston, Tx 77216 409-654-6141 (a Beaumont number)
FEI#741303720

Memorial Hermann Baptist Beaumont
P.O.Box 54827
New Orleans, La. 70154

Memorial Hermann Baptist Beaumont
3576 College
Beaumont, Tx 77701

For the Orange hospital the follow appear:

Memorial Hermann Baptist Orange
P.O.Box 201717
Houston, Tx 77216
FEI#741303720

Memorial Hermann Baptist Orange
P.O. Box 54827
New Orleans, La. 70154

Baptist Hospital Orange
608 Strickland Dr.
Orange, Tx 77630

Memorial Hermann Baptist Orange
P.O. Box 200876
Houston, Tx
1-800-227-2686

FEI#752220889 (it is the Relator's understanding that the tax ID number changed for Orange sometime around Jan. 1,2001)

The Provider numbers are as follows:
Beaumont Baptist: #450346
Orange Baptist:#450005

Respectfully submitted,

Linda Hitter

Date: 8/24/02

8